NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0573n.06
Filed: August 10, 2006

**No. 04-3711**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

STELLA TURNER,

     **Plaintiff-Appellant,**

v.

CITY OF ENGLEWOOD,

     **Defendant-Appellee.**

                               /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO**

**BEFORE:**     **SILER, CLAY, and McKEAGUE, Circuit Judges.**

**CLAY, Circuit Judge.** Plaintiff, Stella Turner, appeals the magistrate judge's grant of Defendant, City of Englewood's, motion for summary judgment dismissing Plaintiff's Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Rehabilitation Act, 29 U.S.C. § 794, claims; and which also dismissed Plaintiff's constitutional claim alleging a denial of substantive due process. Plaintiff's claims arose out of an action taken by Defendant in which it rezoned Plaintiff's property in Englewood, Ohio to residential-use only.

After reviewing the parties' briefs and the relevant evidence, we conclude that summary judgment was appropriate, and **AFFIRM** the magistrate judge's Order dismissing Plaintiff's complaint.

No. 04-3711

I.

On February 3, 1999, Plaintiff and her now-deceased husband purchased the property located at 20 North Union Boulevard in Englewood, Ohio, which is commonly known both as "Turner Villa" and "Englewood Manor."[1] Turner Villa had previously been operated as a nursing home. On July 12, 1999, Plaintiff and her husband leased Turner Villa to Adult Care Operations Management, Inc. ("ACOM"), operated by Ernie Lawson, for a ten year period. ACOM applied to Defendant for an occupancy permit to operate a "rest home" at Turner Villa, but actually operated a "group home" that housed "mentally retarded individuals and/or drug addicts."[2] ACOM ran the group home for approximately eighteen months, during which time the Defendant city received over one hundred emergency calls to the property, including calls reporting violence.

ACOM was apparently not making timely rental payments to Plaintiff, and in September 2001, Plaintiff barricaded herself inside the offices at Turner Villa, in an effort to evict ACOM from the premises. The police responded to the incident, along with several state and local agencies who were concerned with the safety and welfare of the residents. A temporary resolution was reached, whereby the residents were allowed to remain until December 31, 2000, at which time Defendant evicted ACOM and its clients. Just prior to ACOM's departure, Defendant issued a letter to Plaintiff on December 21, 2000, revoking the "Certificate of Use and Occupancy Permit" for Turner Villa.

---

[1]We will hereinafter refer to the property as "Turner Villa."

[2]*The American Heritage Dictionary of English Language* (4th Ed. 2000), defines a "rest home" as "an establishment where the elderly or frail are housed and cared for," and defines "group home" as "a small supervised residential facility, as for mentally ill people or wards of the state, in which residents typically participate in daily tasks and are often free to come and go on a voluntary basis."

The revocation letter stated that Plaintiff could reapply for a permit "by filing an application explaining precisely what uses are proposed for the premises." (J.A. at 1031.)

Defendant issued a Notice of Public Hearing scheduled for January 11, 2001, to consider a change in zoning classification for the property at 20 North Union Boulevard from "R-5 Residential (multi-family)" to "R-1 Residential (single family)." (J.A. at 1158.) Plaintiff's attorney spoke on Plaintiff's behalf at the January 11, 2001 meeting, indicating that Plaintiff had another possible tenant interested in using the building. (J.A. at 1159.)

On January 25, 2002, the Englewood City Manager swore out an affidavit stating that the property was a present danger to the health, safety and welfare of the citizens of the city and that he would characterize the property as a "community nuisance when vacated by the former occupants." (J.A. at 1161.) Plaintiff filed an initial application for a new occupancy permit on January 26, 2001, in which she stated that the property would be used as a "group home for people capable of some aspects of independent living, but requiring adult supervision in other aspects." (J.A. at 1109.) In response to the application, Defendant imposed some conditions on Plaintiff and requested a $75 filing fee, but Plaintiff never actually submitted the fee or completed the filing.

On February 21, 2001, at the recommendation of its Planning and Zoning Boards, the Englewood City Council rezoned Turner Villa from R-5 to R-1 (single family home use). Defendant indicated in a letter dated February 13, 2001, that it was rezoning the property because of substantial changes in area conditions and for "more appropriate conformance to the adopted Englewood land use plan and its relative priorities." (J.A. at 1095.)

3

Meanwhile, on March 7, 2001, Dorothy Asher of Angels Sent Nursing, filed an application for a certificate of occupancy, proposing to run a group home at the property. According to the affidavit of Jeffrey Bothwell, that application was rejected as being inadequate to achieve occupancy of the property because it referenced a group home and failed to sufficiently state the breadth of the proposed operation. Furthermore, it was "filed subsequent to a city-initiated rezoning of the Property." (J.A. at 1124.)

On March 9, 2001, Plaintiff appealed to the Montgomery County Court of Common Pleas, challenging Defendant's action in rezoning her property. The state court dismissed the case on the grounds that Defendant's actions were legislative.

Plaintiff filed suit on March 19, 2002, in the United States District Court for the Western District of Ohio, against Defendant City and various city officials,[3] alleging that Defendant had violated her Fifth and Fourteenth Amendment rights by depriving her of property without due process of law or just compensation; that Defendant violated her Fourteenth Amendment right to equal protection under the law by treating her differently from similarly situated property owners in rezoning her property; and that Defendant violated 42 U.S.C. § 1985 by conspiring against

---

[3]Plaintiff's first complaint was filed against the City of Englewood, Eric Smith (City Manager), Michael McNamee (Law Director), and Jeffrey C. Bothwell (Director of Community and Economic Development) in their official capacities along with City Council Members Jim Capise, Tom Franz, Judy Gerhard, Michael Kline, David Jones, and Earnest Lawson in their official capacities. Plaintiff's original complaint also included as a defendant, Earnest Lawson of the Quaker Heights Nursing Home. After some discussion, Plaintiff agreed to dismiss all individually named defendants except City Manager Eric Smith and Director of Community Development, Jeffrey Bothwell. A docket entry was filed to that effect on October 16, 2002.

Plaintiff to deprive her of her constitutional rights. Plaintiff further claimed intentional infliction of emotional distress.

On February 28, 2003, the magistrate judge issued an Order granting in part and denying in part Defendant's motion to dismiss. The magistrate judge dismissed with prejudice all of the following claims: Fifth Amendment takings, Equal Protection, public policy, substantive due process for water disconnection, and intentional infliction of emotional distress. The magistrate judge further ordered Plaintiff to file a second amended complaint by March 14, 2003, eliminating all defendants and claims that were voluntarily conceded or dismissed pursuant to Defendant's motion.

Plaintiff filed a second amended complaint on March 24, 2003, and later filed a third amended complaint on May 12, 2003, naming only the City of Englewood as a defendant. In that complaint, Plaintiff requested a restraining order pursuant to Fed. R. Civ. P. 65 (B) to prohibit Defendant from enforcing the rezoning, alleged violations of the ADA and the Rehabilitation Act of 1973, claimed that she was denied substantive due process, and sought declaratory judgment. On February 5, 2004, Defendant filed a motion for summary judgment, which was granted by the magistrate judge on May 3, 2004. Plaintiff filed this timely appeal on May 25, 2004.

II.

We review a district court's grant of summary judgment *de novo*. *Gerbec v. United States*, 164 F.3d 1015, 1018 (6th Cir. 1999). "Summary judgment is appropriate so long as 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.'" *Williams v. Int'l Paper Co,*, 227 F.3d 706, 710 (6th Cir. 2000) (quoting *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997)). When determining whether to reach this conclusion, this Court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Id.*; *see also Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998).

## III.

The magistrate judge granted Defendant's motion for summary judgment as to Plaintiff's ADA and Rehabilitation Act claims on two alternative grounds. The magistrate judge found that Plaintiff did not have standing to bring suit under the two statutes, but also held that both claims should fail on the merits. For the reasons discussed herein, we find that the magistrate judge erred in finding that Plaintiff did not have standing to bring these claims, but properly granted Defendant's motion for summary judgment on the merits.

1.      *Plaintiff's Standing to Bring Suit On Her Own Behalf*

Under Article III of the Constitution, "[s]tanding is a threshold inquiry in every federal case and it involves an inquiry into whether 'a plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction to justify exercise of the court's remedial powers on his behalf.'" *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth*, 422 U.S. at 498; *see also Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261 (1977) (finding that the plaintiff housing developer met the

constitutional standing requirements for a racial discrimination suit because the challenged actions of the village's housing authority stood as an absolute barrier to constructing the housing that Plaintiff had contracted to place on the site). Under the constitutional requirement, "the plaintiff must show that he himself is injured by the challenged action of the defendant." *Arlington Heights*, 429 U.S. at 261. "The injury may be indirect, but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions." *Id.* (citations omitted). On the other hand, prudential rules of standing serve to limit the role of the courts in resolving public disputes. *Warth*, 422 U.S. at 500. "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.*

Plaintiff brought her claim under Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA's public enforcement provision, § 12133, extends the statute's remedies to "any person alleging discrimination on the basis of disability." The regulations implementing Title II further provide that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g). The Rehabilitation Act similarly states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a)[4]. The Rehabilitation Act protects "any person aggrieved" by the discrimination of a person on the basis of his or her disability. 29 U.S.C. § 794a(a)(2).

The standing question in this case is whether the ADA and the Rehabilitation Act confer standing on a person in Plaintiff's position. We believe that this question has already been answered in the affirmative by the *MX Group* case. 293 F.3d 326. In *MX Group*, the plaintiff, a provider of methadone drug treatment who sought to open a methadone clinic in Covington, Kentucky, was denied a zoning permit and sued the city for discrimination under the ADA and the Rehabilitation Act. This Court held that the plaintiff had "presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities,"[5] and thus had standing to bring suit on its own behalf. *Id*. at 335 (internal citation omitted).

Relying on what it considered to be the importance of the fact that the *MX Group* plaintiff was a provider of services to disabled persons, unlike Plaintiff in the instant case, who is merely the property owner, the magistrate judge found that Plaintiff does not have standing to bring suit under the ADA or Rehabilitation Act. According to the magistrate judge, ACOM, "a service provider like MX Group . . . would have had standing to bring an ADA and Rehabilitation Act claim on behalf of its patients/residents if [Defendant] had acted to terminate its operation at the property in

---

[4]The ADA and Rehabilitation Act claims are primarily analyzed together as both acts are interpreted consistently with one another. *See MX Group*, 293 F.3d at 332.

[5]*MX Group* explained that drug abuse can be considered a mental or physical activity that substantially limits a major life activity. *Id*. at 337. The Court further found that the plaintiff had established that its potential clients "would include persons who are unable to work and function because of their addiction," thereby meeting the statutory requirements for disability under the ADA. *Id*. at 339-40.

discrimination against them for being disabled." (J.A. at 147.) The magistrate judge mistakenly concluded that this "is the holding of *MX Group*," and that Plaintiff does not have standing because she "does not stand in the same relationship to disabled people as the plaintiff in *MX Group* . . . she is not a service provider dedicated to providing services to the disabled." (J.A. at 147.)

The magistrate judge's reasoning on this matter must fail for a number of reasons. First of all, it must fail because this was not, in fact, the holding of *MX Group*. As stated above, the holding of that case was that plaintiff had standing to sue under the ADA and Rehabilitation Act because "*it cares for and/or associates with individuals who have disabilities*." *MX Group*, 293 F.3d at 335 (emphasis added). While the *MX Group* Court did focus heavily on the fact that the plaintiff was a provider of services to the disabled, neither that Court, nor the court in *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997), upon which the *MX Group* Court relied, limited the holding to those who provide services to the disabled. *See Innovative Health Sys.,* 117 F.3d at 47 (finding that both Title II of the ADA and the Rehabilitation Act extend their remedies to "any person" alleging discrimination on the basis of a disability (ADA), or "any person aggrieved by" the discrimination against a person on the basis of his or her disability (Rehabilitation Act), thereby evincing a congressional intent to not limit standing to just the disabled person). Therefore, the magistrate judge's conclusion that Plaintiff cannot have standing because she was not providing services to disabled persons is erroneous.

The magistrate judge's reasoning also must fail because it misapprehends Plaintiff's argument to the court. The substance of Plaintiff's claim is that she herself suffered an injury when Defendant changed the zoning of her property to single-family residential use because of her

9

association with disabled persons who would be the residents of a new group home that Plaintiff sought to establish on the property. The magistrate judge's conclusion that Plaintiff does not have standing to bring suit on behalf of the former ACOM residents misses the point because Plaintiff is not suing on behalf of her former residents, but rather on her own behalf.

Moreover, the magistrate judge was also incorrect in reasoning that Plaintiff does not have standing because she never actually applied for a certificate of occupancy for other companies or individuals to establish a group home on the premises after ACOM left. The magistrate judge concluded that absent such applications and a denial of the permit by Defendant, Plaintiff does not have standing. Again, this misses the point. Plaintiff does not have to show that she applied for and was denied a certificate of occupancy after the building was rezoned, because the rezoning itself is the injury about which she is complaining. Plaintiff has already suffered the injury that forms the basis for the complaint. Defendant's action in rezoning the property effectively prohibits Plaintiff from leasing it to individuals who would provide services to disabled persons. The rezoning is the injury, and the right alleged is Plaintiff's right to associate with disabled persons.

It should also be noted that federal courts have, on several occasions, found that landowners claiming injury as a result of discriminatory city zoning and building laws, had standing to bring suit in their own behalf. *See, e.g. Village of Arlington Heights*, 429 U.S. at 263 (holding that plaintiff real estate developer denied zoning permits to build low cost housing units had standing in his own right to bring suit against the city to redress defendant city's alleged racially discriminatory purpose in denying the permits because the plaintiff had a right to "be free of arbitrary or irrational zoning ordinances."); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1055 (9th Cir. 2002) (finding that

former owners of a night club who brought § 1983 and First Amendment claims against the City of Seattle, challenging the city's public nuisance ordinance, had standing in their own right under the Equal Protection clause because of the personal injury they suffered as a result of their "association with members of a protected class," the African American patrons of the club); *McElroy v. City of Corvallis*, 67 Fed. Appx. 420, 422 (9th Cir. 2003) (unpublished) (finding that the defendant property owner and investor had standing to sue the city because he was injured as a result of the city's discriminatory denial of certificates of occupancy).

We therefore conclude that both Title II and the Rehabilitation Act, as interpreted by the *MX Group* decision, are broad enough to allow Plaintiff to bring this action on her own behalf as a property owner who wishes to lease the property to service providers in order to house and service disabled persons.

### 2.    *The Merits of Plaintiff's ADA and Rehabilitation Act Claims*

Having determined that Plaintiff has standing to bring these claims, we now address the magistrate judge's dismissal of these claims on the merits. We agree with the magistrate judge that both claims should be dismissed, although we employ a different analysis for doing so. As discussed above, both Title II of the ADA and Section 508 of the Rehabilitation Act prohibit disability discrimination by a public entity, *Innovative Health Sys*., 117 F.3d at 44, and Plaintiff here claims that Defendant rezoned her property to single family residential use only because it harbored the unlawful discriminatory purpose of keeping out disabled persons.

In order to state a claim under the two statutes, Plaintiff must first establish that at least some of her future tenants would in fact meet the statutory definition of disabled individuals. To

11

demonstrate a disability under each of these statutes, Plaintiff must show that one or more of her potential residents: (1) have a physical or mental impairment which substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that they are regarded as having such an impairment. *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002). In the present case, however, because it involves a motion for summary judgment and Plaintiff's allegations are taken as true, we will assume for the purpose of this discussion that Plaintiff's potential tenants may be considered disabled under the ADA and proceed to the next stage of the analysis.

We analyze claims of intentional discrimination brought pursuant to the ADA and the Rehabilitation Act under the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Hedrick v. Case Western Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of discrimination under the ADA, Plaintiff must present evidence that "animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Reg'l Econ.*, 294 F.3d at 49 (emphasis in the original); *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 790 (6th Cir. 1996) (citing *Village of Arlington Heights*, 729 U.S. at 270) (stating that the plaintiff must show that "discriminatory purpose was a motivating factor in the City's decision" to rezone her property). Plaintiff need not establish that Defendant's actions were based solely on a discriminatory purpose or even that a discriminatory purpose was the dominant or primary one for rezoning the property.

*See Arlington Heights*, 429 U.S. at 265; *Smith & Lee Associates*, 102 F.3d at 791; *United States v. City of Parma*, *Ohio*, 661 F.2d 562, 575 (6th Cir. (1981) ("There is no requirement that such [discriminatory] intent be the sole basis of official action, if it is a motivating factor."). In contrast, to establish a prima facie case of discrimination under the Rehabilitation Act, Plaintiff "must show that [Defendant rezoned her property] *solely* because of the disability." *Reg'l Econ.*, 294 F.3d at 49 (citations and quotations omitted) (emphasis added).

Discriminatory intent may be inferred from the totality of circumstances and a number of sources, including the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; and the legislative history and contemporary statements by members of the decision-making body. *Arlington Heights*, 429 U.S. at 267-68; *Reg'l Econ.*, 294 F.3d at 49. We pay particular attention to legislative or administrative history, "especially where there are contemporary statements by members of the decisionmaking body, minutes of meetings, or reports." *Arlington Heights*, 429 U.S. at 268.

Once a plaintiff establishes that the defendant's "decision was motivated at least in part by discriminatory animus, the burden shifts to the defendant to prove that it would have made the same decision even if it had not been motivated by an unlawful purpose." *Smith & Lee Assocs.*, 102 F.3d at 791 (citations omitted); *Reg'l Econ.*, 294 F.3d at 49 ("If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision."). Proof that the decisions were motivated in part by a discriminatory purpose will not necessarily require invalidation of the challenged legislative action. *Smith & Lee Assocs.*, 102 F.3d at 791. If the defendant meets its burden of showing that it

would have made the same decision even if not motivated by an unlawful purpose, then the plaintiff must introduce evidence showing that the proffered reason is pretextual. *See Hedrick*, 355 F.3d at 453. "Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times." *Id.*; *see also Reg'l Econ.*, 294 F.3d at 49 ("The plaintiffs must then prove that the defendants intentionally discriminated against them on a prohibited ground.").

First of all, Plaintiff cannot make out a prima facie case of discrimination under the Rehabilitation Act because she cannot prove that discrimination was the sole motivation for Defendant's rezoning of her property. On the contrary, there is ample evidence in the record that Defendant's decision to rezone Plaintiff's property was motivated by other factors including concern for the safety and welfare of the residents of the facility and the community. Our analysis of the Rehabilitation Act claim thus concludes here.

On the other hand, we will assume, without deciding, that Plaintiff's allegations make out a prima facie case of discrimination on the ADA claim. It is undisputed that mentally disabled persons resided at the property while ACOM was present and that these disabled persons, under ACOM's care, caused some problems for Defendant such that Defendant may not have wanted the property to continue to house disabled residents. Therefore, we take Plaintiff's allegations as true in this regard and proceed to a discussion of the pretext prong of the analysis.

Under *McDonnell Douglas*, the burden now shifts to Defendant to proffer a legitimate, non-discriminatory reason for the rezoning, and to establish that it would have made the same decision even if not motivated by discriminatory animus. Defendant meets that burden here. *See Smith & Lee Assocs.*, 102 F.3d at 794 (finding that the defendant was entitled to summary judgment where

defendant had proven by a preponderance of the evidence that it would have denied plaintiff's zoning petition anyway because the members of the city council were all on record as being opposed to spot zoning). Defendant offers two non-discriminatory reasons for its decision to rezone Plaintiff's property to single family use only. First, Defendant argues that the decision was motivated in part by a land use plan for the neighborhood that called for residential use only in the area. Defendant claims that the area had become increasingly residential and that the new land use plan did not allow for the operation of group homes like that run by Plaintiff in the area. Defendant secondly claims that it rezoned the property out of concern for the safety and welfare of the community and the potential residents of the building. We believe that Defendant's stated non-discriminatory reasons, particularly the second explanation, are supported by the record.

It is undisputed that there were over one hundred emergency calls to the property during the time that Plaintiff allowed the former tenant, ACOM, to operate its adult group home at Turner Villa. There were numerous injuries to residents, violent attacks, fires, and incidents of the ACOM residents panhandling in the neighborhood and trespassing on other properties in the neighborhood. There was even a disturbance in which Plaintiff barricaded herself inside the offices of the building and refused to give the ACOM staff access to their records and files. The police, along with various other state and local agencies responded to the incident, in an effort to ensure the safety of the ACOM residents. Under these circumstances, we cannot say that Defendant would not have made the same decision to rezone Plaintiff's property even if it were not partially motivated by discriminatory animus.

Once Defendant presented to the court its non-discriminatory reasons for the zoning action, the burden then shifted back to Plaintiff to present evidence that Defendant's proffered reasons are pretextual. Plaintiff failed to meet this burden, and as a result, summary judgment was appropriate. Plaintiff did not offer in the district court, nor does she present on appeal, sufficient evidence to dispute Defendant's claim that it would have made the same zoning decision absent discriminatory animus.[6] Instead, Plaintiff concedes that there were numerous problems at the building, but merely contends that Defendant should be well-equipped and capable of handling such emergencies. Plaintiff also does not offer any evidence that Defendant's statements about the land use plan for the neighborhood are pretextual. Presented with such evidence from Plaintiff, we may have been inclined to reverse the district court's grant of summary judgment as being premature; however, under *McDonnell Douglas*, we cannot do so unless Plaintiff rebuts Defendant's proffered explanation, which she has failed to do.

---

[6]In contrast to the case before us, there have been situations in which plaintiffs have successfully rebutted as pretextual a public entity's stated non-discriminatory reasons. In particular, in the closely analogous case, *Regional Economy*, the Second Circuit found that the defendant city's proffered reasons for denying the plaintiff a special use zoning permit to build two half-way houses for recovering alcoholics within the city were pretextual and that discriminatory animus against the disabled future residents was the reason that the plaintiff was denied the permit. *Reg'l Econ*, 294 F.3d at 51-52. The *Regional Economy* plaintiff presented the court with significant evidence rebutting the defendants' proffered nondiscriminatory reasons for the decision, including remarks made by city officials and zoning board members stating that they did not want such housing in their area; the fact that a special use permit was granted to the same entity for an adjoining parcel of land that would house a childcare facility; and because the defendant's proffered reasons that they denied the plaintiff a special use permit out of concern for the nuisance effect of a nearby railroad was clearly illegitimate given that a permit was granted to build a childcare facility on the neighboring parcel of land. *Id*. at 51-52. The court found that based on this evidence, a "reasonable juror could refuse to credit the defendant's stated reasons" for denying plaintiff a permit. *Id*. at 52.

We are not able to conclude from the evidence presented, that Defendant's animus was directed at Plaintiff because of her association with disabled persons, rather than because of Plaintiff's poor management and supervision of her property. Plaintiff's only evidence that Defendant might harbor some discriminatory animus towards the disabled is a February 9, 2001 letter in the form of a staff report from the Director of Community Development addressed to the mayor and city council. The letter stated in relevant part that "[t]he City was ecstatic when a new proposal was presented to replace the former nursing home use by a licensed rest home . . . What we got instead was an adult group home and disturbed clients with personality profiles in no way similar to those of a nursing home.[7]" (J.A. at 1127.) The letter then goes on point out that the city has no way of knowing who the next residents may be, and to suggest that it might be in the public interest to rezone the property to single family use only.

While we believe that the February 9, 2001 letter may have helped Plaintiff establish a prima facie case of discrimination (although we still decline to decide the matter here), we do not believe that the letter is enough to rebut Defendant's explanation that it would have made the same decision even if not motivated by discriminatory animus, particularly as the letter specifically refers to ACOM's misrepresentations about the nature of the facility that it intended to run.[8] Plaintiff

[7]It should be remembered, however, that this letter was referencing the fact that ACOM had misrepresented the nature of the proposed facility to Defendant when it applied for the certificate of occupancy, claiming that it was seeking to open a rest home for the elderly, when it in fact operated an adult group home.

[8]Similarly, we are not persuaded by Plaintiff's reference to the minutes from a February 13, 2001 City Council meeting where the following remarks were made:

The City then received a proposal for a "licensed rest home" to replace the former nursing home use. "Licensed rest home" was used by the property agent on his

presents no other evidence of discrimination on the part of Defendant towards disabled persons, or discriminatory statements made by members of the city council or zoning board; nor does she offer evidence that would lead us to conclude that Defendant treated Plaintiff differently from other similarly situated property owners in the area. As a result, we decline to find that the magistrate judge erred in granting Defendant's motion for summary judgment.

IV.

We also find that the magistrate judge properly dismissed Plaintiff's substantive due process claim. Zoning ordinances, like the one at issue, "must find their justification in some aspect of the police power, asserted for the public welfare." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 387 (1926). "The segregation of industries, commercial pursuits, and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety and general welfare of the community." *Id*. at 392. In substantive due process claims, like the present action, the "[p]laintiff claims that the zoning regulation is arbitrary and capricious in that it does not bear a substantial relation to the public health, safety, morals, or general welfare." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992). The federal circuits are divided on the role of federal courts in reviewing substantive due process arbitrary and capricious

---

> application for a Certificate of Occupancy. What was established instead was an adult group home, housing disturbed clients with personality profiles in no way similar to those of nursing home residents. That use has now since ceased, and the building is now vacant.

(J.A. at 1159.) The language in this statement regarding the group home and its clientele is identical language to that in the staff report, and we still do not consider this to be sufficient evidence of discriminatory animus, given that ACOM did in fact misrepresent to Defendant that it intended to operate a "rest home" when it in fact ran a "group home."

claims in the zoning context, and the Supreme Court has failed to provide a definitive standard of review, but the "Court has explicitly observed, however, that citizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Id.* at 1217. (citing *Arlington Heights*, 429 U.S. at 263); *Richardson v. Township of Brady*, 218 F.3d 508, 512 (6th Cir. 2000).

When zoning legislation is subjected to a substantive due process attack, the review by federal courts is more deferential than it is of state administrative action. *Pearson,* 961 F.2d at 1223.[9] "A local zoning ordinance survives a substantive due process challenge if there exists a rational relationship between the terms of the ordinance and a legitimate governmental purpose." *Richardson*, 218 F.3d at 513. When property interests are adversely affected by zoning regulations, the courts have generally sustained the regulation if it is "*rationally related to legitimate state concerns and does not deprive the owner of economically viable use of his property.*" *Pearson*, 961 F.2d at 1223 (citations and quotations omitted) (emphasis in the original) (finding that concerns about traffic and the deterioration of the neighborhood are rationally related to the goals of zoning where plaintiff was denied a permit to open a McDonalds on his property). Beyond that, if the zoning law infringes a protected liberty interest, "it must be narrowly drawn and must further a

---

[9]This Circuit makes a distinction between substantive due process claims involving administrative zoning decisions and those involving legislative actions. *See Pearson*, 961 F.2d at 1220 -21, for a discussion of the administrative/legislative distinction. The decision in the present case should be considered legislative because Plaintiff's property was rezoned pursuant to a vote and action by the City Council. In either case, the inquiry is whether the state action had a rational basis. In administrative cases, however, the federal court may review the evidence before the state administrative agency and that review is limited to a determination of whether the agency has paid attention to the evidence adduced and acted rationally upon it. In legislative cases, the court does not undertake that review at all, but merely determines whether the challenged legislative action is rationally related to legitimate state land use concerns. *Pearson*, 961 F.2d at 1223.

sufficiently substantial government interest." *Id.* (stating that when reviewing legislative acts that deprive citizens of "life, liberty or property," the federal court may only inquire as to whether the "action is rationally related to legitimate state use concerns."). "Even parochial motives, if not based on animosity toward a protected class or similar invidious purpose, will not invalidate local zoning." *Id.* at 1224. This Court has repeatedly stated that "a legislative body need not even select the best or the least restrictive method of attaining its goals so long as the means selected are rationally related to those goals." *Richardson*, 218 F.3d at 515 (quoting *Schenck v. City of Hudson*, 114 F.3d 590, 594 (6th Cir. 1997)). "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." *Village of Euclid*, 272 U.S. at 388.

We conclude that Defendant's decision to rezone Plaintiff's property was rationally related to a legitimate government purpose. We find that Plaintiff's substantive due process claim must fail for all the same reasons that her ADA and Rehabilitation Act claims failed. According to Defendant, the zoning commission ultimately adopted a proposal to rezone the property because it was considered to be inconsistent with a city-wide land use plan, which reflected the increasingly residential nature of the surrounding property, and because of past problems at the building and concern that potential future residents might again place a strain on city resources, and pose a danger to themselves and the surrounding community. Plaintiff had already proven herself to be less than adept at properly maintaining her property, and it was both rational and legitimate for the city to be concerned.

Plaintiff presents no evidence to counter the city's contentions about its land use plan and the residential nature of the neighborhood. Plaintiff also does not dispute that there were numerous emergencies at the property that involved city resources while ACOM occupied the facility. Plaintiff simply has not presented any evidence that Defendant's actions were arbitrary and capricious. On the contrary, Defendant has presented ample evidence that its actions were rationally related to the legitimate governmental purpose of bringing the property in line with the city's land use plan and protecting the safety, health and welfare of the residents and the surrounding community. We therefore hold that the magistrate judge properly dismissed Plaintiff's substantive due process claim.

V.

For the foregoing reasons, we **AFFIRM** the magistrate judge's grant of Defendant's motion for summary judgment.